## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS *ex rel.* AMY O'DONNELL, | |
| Relator/Plaintiff, | Case No. 14-cv-1098 |
| v. | |
| AMERICA AT HOME HEALTHCARE AND NURSING SERVICES, LTD., d/b/a ANGELS AT HOME HEALTHCARE, *et al.* | Judge John Robert Blakey |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Relator and Plaintiff Amy O'Donnell ("Relator") filed this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and its Illinois counterpart, the Illinois False Claims Act ("IFCA"), 740 ILCS § 175/1, *et seq.*, on behalf of the United States and the State of Illinois. Relator sues corporate Defendant America at Home Healthcare and Nursing Services, Ltd. d/b/a Angels at Home Healthcare ("AAH"), as well at its purported successor, Great Lakes Acquisition Corp. d/b/a Great Lakes Caring ("Great Lakes"). Relator also sues former AAH employees Rachael Fitzpatrick ("Fitzpatrick"), Tami Shemanske ("Shemanske"), and Kim Richards ("Richards") (collectively, the "Individual Defendants").

Relator alleges that, beginning in 2006, AAH and the Individual Defendants routinely engaged in multiple fraudulent Medicare and Medicaid payment schemes,

which continued after Great Lakes purchased AAH in approximately March 2015. Relator filed her Second Amended Complaint ("SAC") [69] on February 13, 2017. On March 14, 2017, Defendants AAH, Fitzpatrick, Shemanske, and Richards (collectively, the "AAH Defendants") filed a joint Motion to Dismiss Relator's complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). AAH Defs.' Mot. Dismiss [79]. Great Lakes filed its own Motion to Dismiss the same day. Great Lakes' Mot. Dismiss [76]. This Memorandum Opinion and Order addresses both pending motions, which, for the reasons discussed below, are granted in part and denied in part.

## I. Background[1]

### A. Home Health Services Under Medicare and Medicaid

The federal Medicare and Medicaid programs provide government health insurance for elderly, disabled, and low-income Americans. SAC [69] ¶ 45. Both programs, which are administered by the Centers for Medicare and Medicaid Services ("CMS"), reimburse health care providers for certain "home health services" rendered to eligible beneficiaries. *Id.* ¶¶ 46-47. "Home health services" are defined as "items and services" provided on a "visiting basis" by a home health agency ("HHA") to individuals in their place of residence. 42 U.S.C. § 1395x. Defendant AAH, and later Defendant Great Lakes, are two such HHAs. Potential "home health services" include, *inter alia*, part-time or intermittent nursing care,

---

[1] The below facts are derived primarily from Relator's SAC [69] and, for the purposes of Defendants' motions, accepted as true. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). This Court is not, however, required to accept as true conclusory statements of law. *Northern Trust Co. v. Peters,* 69 F.3d 123, 129 (7th Cir. 1995).

physical or occupational therapy or speech-language pathology services, medical social services, and part-time or intermittent services of a home health aide. SAC [69] ¶ 47.

To qualify for home health services, a beneficiary must be: (1) confined to his home or in an institution that is not a hospital, skilled nursing facility, or nursing facility; (2) under the care of a physician who establishes and periodically reviews a plan of care; and (3) in need of at least one of the aforementioned home health services, as certified by a physician. *Id.* ¶ 50.

According to Relator, HHAs may not solicit patients for home health services. *Id.* ¶ 48. Instead, HHAs must receive a physician referral. *Id.* Moreover, the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, prohibits HHAs from paying kickbacks, bribes, or rebates to doctors (or any other individual) in exchange for home health service referrals. Similarly, the Stark Law, 42 U.S.C. § 1395nn(a)(1), prohibits a physician from referring patients to entities with which the physician maintains a financial relationship.

Upon receipt of a physician's referral, an HHA conducts its own initial medical assessment to determine a patient's medical needs and eligibility for home health services. SAC [69] ¶ 58. The HHA documents this initial assessment in an Outcome and Assessment Information Set ("OASIS") form and transmits that form to the government. *Id.* ¶ 59. Federal regulations require that this data accurately reflect the patient's status at the time of the assessment. *Id.* ¶ 88.

3

Medicare pays HHAs through what is known as the Prospective Payment System ("PPS"). *Id*. ¶ 66. PPS payments are based upon sixty-day "episodes" of care, and are designed to reimburse HHAs for all items and services provided during that period. *Id*. ¶ 67. These episodic payments are further divided into an estimated payment at the onset of the sixty-day period, followed by a residual payment at the close of the episode. *Id*. ¶ 71.

Residual payments are occasionally subject to adjustments. One potential downward adjustment—known as a "low-utilization payment adjustment" or "LUPA"—occurs when a patient is visited by the HHA four or fewer times during the 60-day episode of care. *Id*. ¶ 72. Upward adjustments, on the other hand, may occur when an HHA reaches certain "therapy thresholds." *Id*. ¶ 73. Under this three-tiered step system, payments are progressively increased when a patient receives six, fourteen, or twenty therapy visits during an episode of care. *Id*.

In addition to payment adjustments *within* each episode of care, payments *across* multiple episodes may be adjusted to account for the patient's changing health condition, clinical characteristics, and service needs (known as the "case-mix adjustment"). *Id*. ¶¶ 67-68. There are eighty established case-mix groups (known as "Home Health Resource Groups," or "HHRGs"), which are based upon score values derived from the patient's OASIS form. *Id*. ¶¶ 68-69.

After a patient's sixty-day episode of care has ended, the patient may be re-certified for an additional sixty-day period, provided that home health care continues to meet coverage rules. *Id*. ¶ 74. To recertify, the HHA must determine

(through its own assessment) that the patient remains homebound and continues to require a qualifying home health service. *Id.* ¶ 63. Based upon the HHAs findings, a physician then re-certifies the qualifying conditions and plan of care for the patient. *Id.* ¶ 62. As with the initial episode of care, the HHA must document its recertification assessment in an OASIS form and transmit that form to the government. *Id.* ¶¶ 64, 87.

### B. The Present Litigation

Relator is a licensed registered nurse who was employed by AAH as a case manager between January 2008 and June 2011. SAC [69] ¶ 10. Relator alleges that beginning in 2006, Defendants fraudulently billed the government for millions of dollars of Medicare and Medicaid services that violated the assorted regulations discussed above. *Id.* ¶ 105. Specifically, Relator alleges that Defendants:

- **"Upcoded" or artificially inflated bills to the government.** *See id.* ¶¶ 195-218. Relator claims that Defendants, in an effort to maximize revenues, instructed employees to inflate HHRG scores, as well as increase patient visits to avoid LUPAs and exceed therapy thresholds, without regard to medical necessity.

- **Billed for unnecessary and duplicative personal care services.** *See id.* ¶¶ 219-32. Relator claims that Defendants instructed home health aides to provide personal care services to residents of assisted living facilities even though such services were already provided by facility personnel.

- **Provided illegal kickbacks to AAH staff and physicians in exchange for referrals and certifications.** *See id.* ¶¶ 168-94.

- **Unlawfully solicited patients for home health services.** *See id.* ¶¶ 146-67.

- **Caused patients to be certified and/or recertified for home health services that were not medically necessary.** *See id.*

¶¶ 108-45. Relator claims that Defendants instructed employees to: falsify patient records, including OASIS forms, to make it appear that home health services were necessary; generate home health plans of care for ineligible patients; and draft false physician orders for certification.

Relator claims that many of these instances involved the Individual Defendants, and continued after Defendant Great Lakes purchased AAH in March 2015. *Id.* ¶ 4.

Relator originally filed suit in this Court on February 14, 2014. *See* Compl. [1]. The United States declined to intervene on April 18, 2016, *see* Notice [10], and the record was unsealed on April 26, 2016. Order [12]. Relator originally brought four claims in her SAC:

- **Count I.** Violations of the FCA for knowingly presenting, or causing to be presented to the government, a false or fraudulent claim for payment, *see* 31 U.S.C. § 3729(a)(1)(A), as well as knowingly making or using a false record or statement that is material to a false or fraudulent claim paid by the government, *see id.* § 3729(a)(1)(B);[2]

- **Count II.** Violations of the FCA for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government, *see id.* § 3729(a)(1)(G);

---

[2] These specific statutory citations correspond to the version of the FCA effective May 20, 2009, following an amendment by the Fraud Enforcement and Recovery Act of 2009. *See* Pub. L. No. 111-21, 123 Stat. 1617, 1621-25 (2009). Prior to the amendment, the relevant statutory citations would have been 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(2), respectively. The amendment generally applies only to conduct that occurred after May 20, 2009. *See* § 4(f), 123 Stat. at 1625. The amendment to § 3729(a)(2) (now § 3729(a)(1)(B)), however, applies to all claims pending on and after June 7, 2008. *Id.*; *see also U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 (7th Cir. 2009) (acknowledging the exception Congress made for applying § 3729(a)(1)(B) to claims brought before May 20, 2009).

Here, Relator's allegations span both versions of the statute, including § 3729(a)(2) (now § 3729(a)(1)(B)). *See generally* SAC [69] (alleging misconduct between approximately 2006 and at least 2015). The precise language of the various statutory iterations at issue, however, does not alter any portion of the Court's substantive analysis. For ease of reading, therefore, the Court refers to particular statutory provisions in their current designation.

- **Count III.** Conspiracy to violate the FCA, *see id.* § 3729(a)(1)(C); and

- **Count V.**[3] Corresponding violations of the IFCA, *see* 740 ILCS §§ 175/3(a)(1)(A)-(C), (G).

SAC [69] ¶¶ 240-96.

In her response to Defendants' motions, Relator "does not contest Defendants' challenges" to Counts II and III. Rel.'s Resp. [85] 3 n. 2. Defendants' motions to dismiss are therefore granted as to those claims. The Court analyzes Defendants' remaining challenges to Counts I and V below.

## II.    Legal Standard

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). To survive a motion to dismiss, a complaint must first provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice" of what the claim is "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Second, the complaint must contain "sufficient factual matter" to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). That is, the allegations must raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs. Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). The plausibility standard "is not akin

[3] The SAC [69] does not list a Count IV.

to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The "amount of factual allegations required to state a plausible claim for relief depends on the complexity of the legal theory alleged," but "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating the complaint, the Court draws all reasonable inferences in favor of Relator. *Iqbal*, 556 U.S. at 678.

Additionally, the FCA "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *United States ex rel. Gross v. AIDS Research All.–Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) mandates that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated "with particularity." In adding "flesh to the bones of the word particularity," the Seventh Circuit has "often incanted that a plaintiff ordinarily must describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (internal quotations omitted). In other words, if the fraudulent scheme involves misrepresentation, the plaintiff must state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was

communicated[.]" *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994).

At the same time, the Seventh Circuit has warned against taking "an overly rigid" view of this shorthand formulation. *Pirelli*, 631 F.3d at 442. The precise details that must be included in a complaint—even one subject to Rule 9(b)—"may vary on the facts of a given case." *Id.* The operative issue is whether a plaintiff uses some means "of injecting precision and some measure of substantiation into their allegations of fraud." *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotations omitted).

Rule 9(b)'s heightened pleading requirements serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions"; and (3) providing notice of the claim to the adverse party. *Id.* The importance of providing fair notice means that a plaintiff who pleads fraud "must 'reasonably notify the defendants of their purported role in the scheme.'" *Id.* at 778 (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)); *see also Guarantee Co. of N. Am., USA v. Moecherville Water Dist., N .F.P.*, No. 06-cv-6040, 2007 WL 2225834, at *2 (N.D. Ill. July 26, 2007) ("The purpose of the more restrictive pleading standard is to ensure that the accused party is given adequate notice of the specific activity that the plaintiff claims constituted the fraud, so that the accused party may file an effective responsive pleading."). To that end, "Rule 9(b) is of especial importance in a case involving multiple defendants. Where there are allegations of a fraudulent scheme with more than one defendant, the complaint

9

should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant." *Balabanos v. N. Am. Inv. Grp., Ltd.*, 708 F. Supp. 1488, 1493 (N.D. Ill. 1988).

## III. Analysis

### A. The FCA and IFCA

The FCA seeks "to protect the funds and property of the Government from fraudulent claims," *Rainwater v. United States,* 356 U.S. 590, 592 (1958), by "imposing civil liability on an individual or entity that makes such a claim." *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 111 F. Supp. 3d 923, 926 (E.D. Wis. 2015); *see also* 31 U.S.C. § 3729(a)(1). Enacted in 1863, the FCA "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." *United States v. Bornstein,* 423 U.S. 303, 309 (1976). Since then, "Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) ("*Escobar II*").

A "claim" includes "direct requests to the Government for payment," as well as "reimbursement requests made to the recipients of federal funds under federal benefits programs" such as Medicare and Medicaid. *Id.*; *see also* 31 U.S.C. § 3729(b)(2)(A). In its present incarnation, the FCA allows the government to recover treble damages, as well as a $5,000-$10,000 penalty for each fraudulent submission, regardless of actual damage. *Neal v. Honeywell, Inc.*, 826 F. Supp. 266, 268 (N.D.

10

Ill. 1993), *aff'd*, 33 F.3d 860 (7th Cir. 1994). The FCA also permits private citizens, or "relators," to file a civil action on behalf of the government. 31 U.S.C. § 3730(b)(1). These actions are referred to as *qui tam* actions.[4] *United States ex rel. Yannacopoulos v. General Dynamics,* 652 F.3d 818, 822 (7th Cir. 2011). As an "incentive to bring suit," a prevailing relator "may collect a substantial percentage of any funds recovered for the benefit of the government." *Id*. IFCA claims are evaluated under standards identical to those applied in cases arising under the FCA. *Cunliffe v. Wright*, 51 F. Supp. 3d 721, 740 (N.D. Ill. 2014).

The FCA and IFCA each prohibit: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment, *see* 31 U.S.C. § 3729(a)(1)(A); 740 ILCS § 175/3(a)(1)(A); and (2) knowingly making or using, or causing to be made or used, a false record or statement that is material to a false or fraudulent claim. *See* 31 U.S.C. § 3729(a)(1)(B); 740 ILCS § 175/3(a)(1)(B). Here, Relator alleges violations of both provisions.

To adequately plead a violation of § 3729(a)(1)(A) of the FCA (or § 175/3(a)(1)(A) of the IFCA), Relator must allege: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *United States ex rel. Fowler v. Caremark RX, L.L.C.,* 496 F.3d 730, 741 (7th Cir.

---

[4] The term *qui tam* "is derived from the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur,* which means 'who brings the action for the king as well as for himself.'" *Neal v. Honeywell, Inc.*, 826 F. Supp. 266, 268 (N.D. Ill. 1993), *aff'd*, 33 F.3d 860 (7th Cir. 1994) (citing William Blackstone, *Commentaries on the Law of England* 160 (1768)).

2007), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009).

To adequately plead a violation of § 3729(a)(1)(B) of the FCA (or § 175/3(a)(1)(B) of the IFCA), a plaintiff must allege that: (1) the defendant made a statement in order to receive money from the government; (2) the statement was false; and (3) the defendant knew the statement was false. *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 998 (7th Cir. 2014). In addition, the misrepresentation "must be material to the other party's course of action." *Escobar II*, 136 S. Ct. at 2001.

Stated broadly, the AAH Defendants argue that the allegations in Relator's SAC: (1) do not allege materially false misrepresentations under the FCA; (2) are not sufficiently particular under Rule 9(b); and (3) fail to state claims for which relief may be granted under Rule 12(b)(6). Additionally, Defendant Great Lakes separately asserts that Relator has failed to plead any cognizable claims against Great Lakes. Finally, all Defendants contend that Relator released her present claims when she accepted a settlement in a prior lawsuit. The Court addresses each objection in turn.

### B.    Materiality

To adequately state a violation of § 3729(a)(1)(B), Relator must not only allege that Defendants knowingly made a false statement in order to receive money from the government, but also that the false statement was material to the government's decision to pay. *U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d

556, 561 (7th Cir. 2015), *cert. denied,* 136 S. Ct. 2510 (2016); *see also* 31 U.S.C. § 3729(a)(1)(B) (imposing liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim") (emphasis added).

Additionally, § 3729(a)(1)(A) not only encompasses claims that make fraudulent misrepresentations, but also claims which include materially misleading *omissions*. *Escobar II*, 136 S. Ct. at 1999. Specifically, liability may attach where two conditions are satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with *material* statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001 (emphasis added). This is commonly referred to as an "implied false certification" theory of liability. *Id.* at 1995.

Here, Relator alleges multiple false statements and omissions on the part of Defendants. First, as discussed above, Relator claims that Defendants falsified, or caused to be falsified, OASIS forms regarding patients' need for home health services. *See, e.g.,* SAC [69] ¶¶ 130, 212. Second, in order to bill for Medicare services, HHAs must first submit an enrollment application to CMS. *Id.* ¶ 77. As part of this agreement, HHAs certify that they "agree to abide by the Medicare laws, regulations and program instructions" and that "payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to,

the Federal antikickback statute and the Stark law)." *Id.* ¶ 78. HHAs further agree to not "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," or "submit claims with deliberate ignorance or reckless disregard of their truth or falsity." *Id.* Once their enrollment application is approved, HHAs must submit similar certifications to report changes to their enrollment information. *Id.* ¶ 80. Relator claims that during the relevant period, AAH submitted multiple versions of this certification that, due to AAH's fraudulent business practices, were false. *Id.* ¶¶ 81-82.

Third, CMS contracts with financial intermediaries to assist in the administration of home health claims. *Id.* ¶ 70. To be paid for covered services, HHAs must file an annual cost report with its intermediaries. *Id.* ¶ 92. Certifiers of cost reports must attest to the following:

> I hereby certify that . . . I have examined the accompanying home health cost report and the balance sheet and statement of revenue and expenses . . . and that to the best of my knowledge and belief, it is a true, correct, and complete report prepared from the books and records of the provider . . . . I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*Id.* ¶ 95. In this case, Relator asserts that AAH submitted false annual cost reports throughout the relevant period. *Id.* ¶ 93.

Finally, Medicare claims themselves may be submitted electronically or through standardized paper forms. SAC [69] ¶ 85. To submit claims electronically, HHAs must agree to "submit claims that are accurate, complete, and truthful." *Id.*

¶ 84. The standardized form also states that submission of a claim "constitutes certification that the billing information as shown on the face hereof is true, accurate and complete," and that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." *Id.* ¶ 85. Here, Relator alleges that AAH submitted both electronic and paper claims throughout the relevant period that failed to disclose its regulatory violations. *Id.* ¶¶ 83, 85.

In response, Defendants argue that, even taking Relator's allegations as true, such statements and omissions are immaterial to the government's decision to pay reimbursement claims. Indeed, the materiality standard is "rigorous" and "demanding." *Escobar II*, 136 S. Ct. at 1996. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see also United States v. Rogan,* 517 F.3d 449, 452 (7th Cir. 2008) (defining "materiality" in the FCA context as a statement with "a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed"). This is an objective standard, and "case law focuses on whether the *false statement itself*, rather than the *certificate or document* containing that statement, is capable of influencing the government's decision." *Marshall*, 812 F.3d at 563 (emphasis added).

Furthermore, materiality in the implied certification context does not wholly depend upon the government *expressly* designating the contractual, statutory, or regulatory provision at issue as a condition of payment. *Escobar II*, 136 S. Ct. at

15

2001. A statement that "misleadingly omits critical facts" constitutes a material misrepresentation "irrespective of whether the other party has *expressly* signaled the importance of the qualifying information." *Id.* (emphasis added). At the same time, the FCA "is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 2003 (internal citation omitted). Thus, not *every* undisclosed violation of an express condition of payment automatically triggers liability. *Id.* Materiality cannot be found "where noncompliance is minor or insubstantial"; nor is it sufficient that the government would "have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

In essence, when evaluating materiality in the implied certification context, the "Government's decision to expressly identify a provision as a condition of payment *is relevant, but not automatically dispositive.*" *Id.* (emphasis added). In addition,

> proof of materiality can also include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-04.

Defendants argue that the statements and regulations alleged here fall into the realm of immaterial "garden variety" fraud. *See id.* at 2003. In support of their argument, Defendants rely heavily upon *Escobar II*. There, a teenage beneficiary of Massachusetts' Medicaid program received counseling services at a satellite mental health facility owned and operated by a subsidiary of Universal Health Services. *Id.* at 1997. Tragically, the teenager suffered a deadly adverse reaction to medication prescribed by a purported doctor at the facility. *Id.* Thereafter, it was revealed that, contrary to state regulations, many of the facility employees were not licensed to provide mental health services, yet still counseled patients and prescribed drugs without supervision. *Id.* The teenager's parents subsequently filed an FCA *qui tam* suit. *Id.* Relying upon an "implied false certification" theory of liability, the parents alleged that Universal's Medicaid reimbursement claims were false because they failed to disclose its state regulatory violations pertaining to staff qualifications and licensing requirements. *Id.* at 1997-98.

A close reading of *Escobar II* and its procedural progeny, however, belies Defendants' theory. In the end, even though the Supreme Court remanded *Escobar II* for reconsideration of whether the relators sufficiently pled a material omission, *id.* at 2004, the Court also noted that the supposed misrepresentations at issue (compliance with the state's mental health facility requirements) were alleged to be "so central to the provision of mental health counseling that the Medicaid program would not have paid these claims had it known of these violations." *Id.* The Court acknowledged that, on such allegations, the relators "may well have adequately

17

pleaded a violation" of the FCA, but left it "to the courts below" to resolve the question in the first instance. *Id.*

On remand, the First Circuit had "little difficulty" reaffirming that the relators had sufficiently alleged Universal's misrepresentations to be material. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016). The court reached this conclusion for three reasons. First, it was relevant (though not dispositive) that the relators alleged that regulatory compliance was a condition of payment. *Id.* Second, the court found that the Massachusetts licensing and supervision requirements which were circumvented by Universal went to "the very essence of the bargain" of the state's contractual relationships with healthcare providers under the Medicaid program. *Id.* Finally, there was no evidence in the record that Massachusetts paid claims to Universal despite knowing of the violations. *Id.*

As in *Escobar*, Relator here explicitly alleges that compliance with the Medicare and Medicaid regulations named in the SAC is a condition of payment. *See* SAC [69] ¶¶ 49, 65, 90-91, 291. Moreover, courts have routinely found the various statements and regulations at issue to be central to the government's Medicare and Medicaid programs. *See United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) ("[I]nformation that a hospital has purchased patients by paying kickbacks has a good probability of affecting" a repayment decision); *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004) ("A certificate of compliance with federal health care law is a prerequisite to eligibility under the

Medicare program. It follows that Schmidt alleged a violation of the FCA when he alleged that *Mercy* certified its compliance with federal health care law knowing that certification to be false.") (internal citation omitted); *United States ex rel. Cieszyski v. LifeWatch Servs., Inc.*, No. 13-cv-4052, 2015 WL 6153937, at *9 (N.D. Ill. Oct. 19, 2015); *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 739 (N.D. Ill. 2010) ("Providers are required to submit annual cost reports . . . . Each cost report includes a certification attesting to compliance with healthcare laws and regulations, including anti-kickback provisions. . . . Mason has sufficiently alleged that the cost report certifications are a required condition of government payment under federal healthcare programs. The allegation is more than speculative. Certifications are material to government reimbursement under Medicare."); *U.S. ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 616 (N.D. Ill. 2003) ("[T]he alleged AKS violation is material to the government's treatment of defendants' reimbursement claims."). Finally, the SAC contains no allegations that either the federal government or the State of Illinois paid claims to Defendants despite knowing of the supposed violations.[5] Thus, Defendants' "garden-variety fraud" theory fails to

---

[5] In their motion to dismiss, the AAH Defendants claim that the government did not disqualify AAH from the Medicare or Medicaid program despite reviewing AAH's recertification practices in 2008, 2011, and 2014. Mem. Supp. AAH Defs.' Mot. Dismiss [56] 10-11. In support of their assertion, Defendants submit a CMS "Statement of Deficiencies and Plan of Correction" form dated September 2, 2011, which states that AAH "was found to be in compliance with the requirements of 42 CFR 484." *Id.* Ex. A. When considering a motion to dismiss pursuant to Rule 12(b)(6), however, the Court's inquiry "is generally limited to the factual allegations contained within the four corners of the complaint." *Mannie v. Potter*, 326 F. Supp. 2d 880, 882 (N.D. Ill. 2004); *see also U.S. ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 893 n. 1 (N.D. Ill. 2009) ("In his response to Defendants' Motion to Dismiss, Walner set forth additional facts to support his claims and attached various exhibits, including his own declaration. Walner's response and attached exhibits, however, are not part of the pleadings and are therefore outside the scope of the Court's 12(b)(6) analysis."). Although the AAH Defendants seek to paint their evidence as a proper subject for judicial notice, *see Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) (permitting courts to

undermine the materiality of the SAC's allegations. *See Menzies v. Seyfarth Shaw LLP*, 197 F. Supp. 3d 1076, 1098 (N.D. Ill. 2016) (rejection of "garden-variety fraud" challenge to a RICO complaint).

## C.     Particularity

### 1.     Allegations against the Individual Defendants

Defendants next argue that various portions of the SAC fail to satisfy Rule 9(b)'s particularity requirement.  Defendants claim, for example, that the SAC fails as to the Individual Defendants because it relies upon impermissible group pleading.  As stated *supra*, to comply with Rule 9(b), a complaint "should not lump multiple defendants together, but should inform each defendant of the specific fraudulent acts that constitute the basis of the action against the particular defendant."  *Suburban Buick, Inc. v. Gargo*, No. 08-cv-0370, 2009 WL 1543709, at *4 (N.D. Ill. 2009) (internal citation omitted).  Defendants claim that the SAC references collective "Defendants" but does not present individualized allegations against Defendants Fitzpatrick, Shemanske, and Richards.

Defendants correctly state the law, but largely misread the SAC, at least as it applies to Defendants Fitzpatrick and Shemanske.  The SAC does indeed make frequent reference to collective groups of defendants[6] which, standing alone, would

consider "information that is properly subject to judicial notice" on a motion to dismiss), such an argument is unavailing.  *See* Fed. R. Evid. 201 (defining facts that may be judicially noticed as those "not subject to reasonable dispute").

[6] *See, e.g.,* Second Am. Compl. [69] ¶¶ 97 ("On information and belief, *Defendants* made the foregoing submissions and certifications, repeatedly, in the course of submitting claims for reimbursement") (emphasis added), 105 ("From at least 2006 and continuing through July 2015, the *AAH Healthcare Defendants* generated millions of dollars annually in revenues through the billing of Medicare and Medicaid for services provided to patients by engaging in, and/or participating conspiratorially in,

be insufficient under Rule 9(b). At the same time, however, the SAC also outlines

multiple *specific* instances of purportedly fraudulent activity on the part of

Defendants Fitzpatrick and Shemanske:

- Between approximately December 2008 and January 2009, **Defendant Fitzpatrick** ordered Relator and another nurse, Jolynn Bartlett, to fraudulently recertify nine AAH patients at Spring Meadows Nursing Home in Naperville, Illinois for unnecessary home health services. SAC [69] ¶¶ 111-24.

- In approximately December 2010, **Defendants Fitzpatrick and Shemanske** ordered Relator to fraudulently certify A.Z., an AAH patient at Brighton Gardens in Orland Park, Illinois, for physical therapy. *Id.* ¶ 125.

- In approximately June 2011, **Defendant Fitzpatrick** ordered nurse Andrea Castrejon to recertify a patient for home health services even though Castrejon believed home health services were no longer necessary. *Id.* ¶ 127.

- On approximately May 30, 2015, **Defendant Shemanske** arranged for orders certifying a patient for skilled nursing care, even though Sue Suria, AAH's physical therapy supervisor, determined that skilled nursing care was unnecessary. *Id.* ¶ 136.

Defendants' argument as it relates to Defendants Fitzpatrick and Shemanske,

therefore, is denied.

The same cannot be said, however, for Defendant Richards. In terms of

allegations that specifically relate to *that* individual defendant, the SAC states:

- "In connection with their home health care business, Defendant AAH Healthcare and Defendants Fitzpatrick, Shemanske, **and Richards** intentionally and knowingly submitted false and fraudulent claims and statements for payment to Medicare and Medicaid." *Id.* ¶ 2 (emphasis added).

---

the following fraudulent and unlawful activities . . . .") (emphasis added), 145 ("The *AAH Healthcare Defendants* submitted claims for payment to the Government for home health services provided to patients that were ineligible for home health services") (emphasis added).

- "[B]eginning as early as 2006 and lasting through 2010, Defendant Fitzpatrick **and Defendant Richards** routinely instructed [nurse Patti Dougherty] and other nurses to certify and recertify ineligible patients for home health care services. . . . Dougherty did as she was instructed at least a dozen times." *Id.* ¶ 128 (emphasis added).

- **Defendant Richards** paid one of her employees in Massachusetts "illegal remuneration for referrals and recertifications." *Id.* ¶¶ 168, 176 (emphasis added).

- Between 2006 and 2010, **Defendants Richards** instructed nurses "to select the higher HHRG number when in doubt, rather than instructing them to carefully reassess the patient to determine the correct HHRG score." *Id.* ¶ 212 (emphasis added).

These sweeping allegations may list Defendant Richards by name, but they each lack other elements of particularity required by Rule 9(b). Some allegations— such as those related to improper certifications and upcoding—raise broad, multi-year time periods without listing any representative examples or specifics. Others, such as Defendant Richards' payment of illegal kickbacks, fail to identify the particular AAH employee involved. Under Rule 9(b), this is not enough. Accordingly, the AAH Defendants' Motion to Dismiss [79] is granted as it relates to Defendant Richards.

### 2. Submission of a False Claim

Defendants next argue that the SAC does not particularly allege "the *actual* submission of a false claim." Mem. Supp. AAH Defs.' Mot. Dismiss [56] 7 (emphasis added). In other words, Defendants attack Relator's failure to link her various theories of fraud (improper certification of patients, kickbacks, upcoding, etc.) to *specific* government reimbursement claims.

On this issue, the Seventh Circuit's recent decision in *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 772 (7th Cir. 2016), is instructive. The relator there*, a* nurse practitioner, brought an FCA *qui tam* action against the defendants, a mental health clinic and its owner, for "upcoding" and providing gratuitous medical procedures. *Id.* at 772-73. In her complaint, the relator provided multiple examples of what she believed to be "unnecessary medical billings." *Id.* at 774. She also alleged, albeit generally, that the mental health clinic submitted bills "to Medicare and Medicaid programs run by the United States and the State of Wisconsin for services provided to patients." *Id.* The district court dismissed the relator's complaint, holding that the relator did not "definitively allege that at least one patient's bill was submitted to the United States or the State of Wisconsin." *Id.* at 775-76 (emphasis removed).

The Seventh Circuit reversed. According to the court, "a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government." *Id.* at 777 (citing *United States ex rel. Lusby v. Rolls–Royce Corp.*, 570 F.3d 849 (7th Cir. 2009); *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 839 (7th Cir. 2013)). Rather, the relevant inquiry is whether the facts alleged "necessarily [lead] one to the *conclusion* that the defendant" presented claims to the government. *Id.* at 778 (emphasis added). Ultimately, it was sufficient that the relator's complaint in *Presser* alleged that "almost all" of the mental health clinic's patients "dealt with Medicare" and that the defendants' "questionable practices and procedures were applied to all patients at

the clinic." *Id.* Indeed, given the relator's position as a nurse practitioner, "a position that does not appear to include regular access to medical bills," the court did "not see how she would have been able to plead more facts pertaining to the billing process." *Id.* (citing *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail [her] claim.")); *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 818 (N.D. Ill. 2013) ("Rule 9(b) does not act as a rigid bar to filing a charge of fraud for individuals with less than perfect knowledge."). At the pleadings stage, therefore, "an inference [was] enough." *Presser*, 836 F.3d at 778 (quoting *Leveski*, 719 F.3d at 839); *see also Lusby*, 570 F.3d at 854 ("[M]uch knowledge is inferential.").

Here, as in *Presser*, Relator details multiple instances of supposedly fraudulent business practices. Also as in *Presser*, Relator generally alleges that Defendants "intentionally and knowingly submitted false and fraudulent claims and statements for payment to Medicare and Medicaid." SAC [69] ¶ 2; *see also id.* ¶¶ 108 ("Defendants then knowingly submitted claims to Medicaid and Medicare for home health services that were not medically necessary"), 116 ("Defendants had submitted claims for reimbursement and had been paid by Medicare for services provided to these patients even though the patients did not qualify for services"). Given Relator's termination in June 2011 (nearly three years before the filing of the present litigation), it would be unfair to demand that Relator plead more at this stage relating to particular reimbursement claims. For present purposes, it can be

24

reasonably inferred that Defendants presented such claims to the government. *See also United States v. Omnicare, Inc.*, No. 11-cv-8980, 2014 WL 1458443, at *10 (N.D. Ill. Apr. 14, 2014); *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 818 (N.D. Ill. 2013) ("Here, Relators allege specific details about all but the submission of the claims, and they provide reasonable inferences that [defendants] submitted false Medicare claims. They have pleaded on information and belief only facts about the submissions of the claim that are inaccessible to them, and they have stated reasonable grounds for their suspicions."); *U.S. ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007) ("Given the significant proportion of medical care in this country that is financed by Medicare and Medicaid, relators have drawn a reasonable inference that claims for reimbursement . . . were submitted to the federal government or the State of Illinois for payment. For these reasons, dismissal at this stage under Rule 9(b) would be inappropriate.").

### 3. Relator's Individual Theories of Liability

Finally, in addition to attacking Relator's SAC *en masse*, Defendants also raise particularity objections to Relator's individual theories of liability.

#### a) *Upcoding*

##### (1) Inflation of Visits

As it relates to Defendants' supposed improper inflation of patient visits, Defendants claim that Relator fails to identify any particular patients with inflated visit frequency. This Court agrees. The nine paragraphs of the SAC devoted to the

manipulation of visit frequency, *see* SAC [69] ¶¶ 196-204, speak almost entirely in generalities:

- "Defendants fraudulently increased their revenue by instructing nurses and physical therapists, including Relator, Sue Suria, and Patti Dougherty, to visit patients with a frequency that would maximize revenue, without regard to medical necessity." SAC [69] ¶ 196.

- "Defendant Fitzpatrick *routinely* instructed Relator and other nurses to avoid LUPAs in fraudulent ways." *Id.* ¶ 197 (emphasis added).

- "To avoid LUPAs, Defendant Fitzpatrick *repeatedly* forced Relator to add visits for unnecessary physical therapy or skilled nursing." *Id.* ¶ 198 (emphasis added).

- "Relator had *several patients* who required skilled nursing services approximately once a month to change catheters—a visit frequency that would result in a LUPA payment reduction." *Id.* ¶ 199 (emphasis added).

- "[Sue Suria, AAH's physical therapy supervisor] recalls being *routinely* asked to add or subtract visits by AAH Healthcare schedulers in order to manipulate Medicare reimbursement thresholds, without regard to patient needs." *Id.* ¶ 204 (emphasis added).

Relator fails, however, to provide specificity regarding any particular upcoding violation. Of course, where, as here, an alleged FCA scheme "involves numerous transactions occurring over the course of several years, a plaintiff need not provide the details of every fraudulent transaction." *United States ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 800 (N.D. Ill. 2015). At the same time, Relator is required to provide "representative examples." *Id.* (citing *United States ex rel. Geschrey v. Generations Healthcare, LLC,* 922 F. Supp. 2d 695, 702 (N.D. Ill. 2012)); *Singer v. Progressive Care, SC*, 202 F. Supp. 3d 815, 825 (N.D. Ill. 2016). In other words, particularity "has often been interpreted as more than just general

accusations of wrongdoing, but providing at least one specific instance of wrongdoing that satisfies the who, what, where, when and how requirements of Rule 9(b)." *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 878-79 (N.D. Ill. 2012) (citing *United States ex rel. Hebert v. Dizney,* 295 Fed. App'x 717, 722-723 (5th Cir. 2008) (rejecting False Claim Act claim where relator alleged a general policy of waiving copays, but failed to cite any example with specificity)).

Relator provides no such specific instances here. At most, Relator speaks of "a female patient" with a "Foley catheter" and "another patient with a supra pubic catheter," s*ee* SAC [69] ¶ 199, but does not provide additional identifiers. Relator also claims that during Sue Suria's "brief period of employment," she was ordered to provide six physical therapy visits to all patients regardless of need, but omits further chronological detail or representative examples. Relator does mention one occasion "on or about January 21, 2012" where Suria was asked by an AAH employee to "do at least 6 or 7" physical therapy visits for a patient, but does not identify the patient, or, more importantly, whether Suria actually followed the employee's request. Relator also references "another occasion" where another unnamed AAH employee instructed Suria to increase therapy visits for another unidentified patient, but once again, fails to delineate any specific details. Rule 9(b) prohibits such abstraction. The AAH Defendants' Motion to Dismiss [79], therefore, is granted to the extent Relator's theory of liability depends upon the improper inflation of patient visits.

### (2)    HHRG Scores

The same analysis applies to Relator's allegations concerning HHRG scores. *See* SAC [69] ¶¶ 205-12.  There, Relator alleges that she and other AAH nurses were "directed periodically in staff meetings" that, "if a patient was between two [HHRG scores], to choose the higher score to ensure higher reimbursement from Medicare." *Id.* ¶ 209.  Particularity aside, questions remain whether such conduct actually constitutes fraud in the first place.  Regardless, however, Relator does not identify any specific patients to which supposedly inflated HHRG scores were ultimately applied.  As a result, Relator fails to "specifically link"—either explicitly or implicitly—the alleged HHRG scheme "to an actual claim that was submitted to Medicare." *NuWave Monitoring*, 84 F. Supp. 3d at 807.  The AAH Defendants' Motion to Dismiss [79], therefore, is granted to the extent Relator's theory of liability depends upon the manipulation of HHRG scores.

### b)    *Double Billing*

Relator's allegations regarding double billing are equally vague.  *See* SAC [69] ¶¶ 219-32.  Relator references only two senior living facilities (Brighton Gardens and Sunrise Senior Living) where purported double billing occurred.  But once again, Relator fails to mention any specific patients or other requisite details; at most, she discusses the "dementia units." *See id.* ¶¶ 225-36.  Exacerbating Relator's imprecision is her lack of specificity in timing; she only alleges that such misconduct occurred over a three-year period "between approximately June 2008 and June 2011." Rule 9(b) requires more.  The AAH Defendants' Motion to Dismiss

[79], therefore, is granted to the extent Relator's theory of liability depends upon billing for duplicative personal care services.

### c) *Kickbacks*

As stated above, the AKS prohibits *soliciting or receiving* remuneration in return for referring an individual for a service that may be paid for under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1). It further prohibits the *offering or paying* of remuneration to any person to induce that person to refer an individual for a service that may be paid for under a federal health care program. *Id.* § 1320a-7b(b)(2). Although the AKS itself does not provide an express private right of action, courts have recognized FCA claims based upon violations of the statute. *See United States ex rel. Kalec v. NuWave Monitoring, LLC*, 84 F. Supp. 3d 793, 806 (N.D. Ill. 2015) (collecting cases). Where an FCA claim is premised upon the violation of the AKS, however, "the underlying violation must also be pled in compliance with Rule 9(b)." *United States Ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10-cv-368, 2014 WL 3583980, at *1 (N.D. Ill. July 18, 2014). Here, Relator alleges two broad categories of kickbacks: (1) those paid to Defendant Shemanske; and (2) those paid to physicians.[7] The Court addresses each in turn.

### (1) Kickbacks to Defendant Shemanske

Relator broadly alleges that, from approximately 2008 until as late as April 2015, AAH's CEO instructed AAH's human resources director to track all home

---

[7] Relator technically alleges a third category of kickbacks: those purportedly paid by Defendant Richards to one of Defendant Richards' marketers in Massachusetts. *See* Second Am. Compl. [69] ¶¶ 169, 171, 176. Because the Court dismisses the allegations against Richards for other reasons, it need not discuss that kickback claim here.

health service referrals and recertifications within Defendant Shemanske's "geographic territory." *See* SAC [69] ¶¶ 169-70. Relator claims that AAH paid Defendant Shemanske a $100 bonus for every such referral and recertification in order to induce Defendant Shemanske to obtain illegal Medicare and Medicaid referrals and recertifications. *Id.* ¶ 171. Like Relator's upcoding and double billing allegations, however, the SAC once again fails to name any specific patient.

Relator attempts to justify her lack of detail by arguing that her allegations apply to *every* patient certification within Defendant Shemanske's territory. *See* Rel.'s Resp. [85] 33. This purported scope, however, does not relieve Relator of her pleading burdens under Rule 9(b). The Seventh Circuit's ruling in *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014), confirms this point. Like Relator here, the relator in *Grenadyor* filed an FCA suit against a pharmacy for, *inter alia*, providing illegal kickbacks to Medicare and Medicaid customers. *Id.* at 1103. Oddly, the supposed remuneration in that case took the form of "one tin of caviar, plus either a packet of whole grains or a tin of Riga sprats (a small fish packed in oil), plus a Russian language T.V. Guide." *Id.* at 1103, 1107. The complaint alleged that it was the defendant's "standard practice" to give this package with "each" delivery of prescriptions, such that "when customers did not receive their regular monthly allotment, they would telephone [the defendant] to complain." *Id.* at 1107.

On appeal, the Seventh Circuit affirmed dismissal of this portion of relator's complaint on particularity grounds. *Id.* According to the court, the complaint

merely alleged "that *all* customers" received the remuneration package;  to comply with Rule 9(b), however, the relator "would have had to allege" either "that the pharmacy submitted a claim to Medicare (or Medicaid) on behalf of a specific patient who received a kickback," or "at least name a Medicare patient who had received a kickback (presumably if the pharmacy provided a drug to a Medicare patient it billed Medicare for the cost of the drug minus the copay)."  *Id.* (emphasis in original).  By "failing to identify a single patient," the complaint contained "no such allegations."  *Id.*  The same reasoning applies here.  The AAH Defendants' Motion to Dismiss [79], therefore, is granted to the extent Relator's theory of liability depends upon illegal kickbacks to Defendant Shemanske.

### (2)    Kickbacks to Physicians

A portion of Relator's allegations regarding physicians, on the other hand, does not suffer from this deficiency.  *See* SAC [69] ¶¶ 178-94.  Here, Relator provides a specific example where AAH provided physicians with complimentary goods and services in order to induce Medicare and Medicaid referrals and recertifications.  Relator alleges that between 2010 and 2011, AAH provided two doctors (Dr. Zaman and Dr. Nagubadi) with free office space at the Waterford Estates "Wellness Center," as well as free administrative and nursing services from AAH employees.  *Id.* ¶¶ 178-85.  Within the context of the other allegations, this is sufficient to satisfy Rule 9(b).

At the same time, Relator's reference to similar schemes at the Spring Meadows Assisted Living Facility in Libertyville, Illinois and Smith Village Senior

Living Community in Chicago, Illinois, fail to identify the specific physicians at issue. *Id.* ¶¶ 186-87. Merely naming a facility is not enough. The AAH Defendants' Motion to Dismiss [79], therefore, is denied as it relates to supposed illegal kickbacks to Dr. Zaman and Dr. Nagubadi, but granted as it relates to other physicians.[8]

### d)    Solicitation

Regarding solicitation, the SAC does not indicate that Defendants' purported solicitation practices were actually unlawful. *See* SAC [69] ¶¶ 146-67. Instead, Relator alleges that, by soliciting patients, Defendants violated Medicare and Medicaid marketing guidelines, specifically 42 C.F.R. §§ 422.2268(d) and 423.2268(d).[9] *See* SAC [69] ¶ 48. By their plain language, however, these regulations govern Medicare Part D plans, not HHAs. *See* 42 C.F.R. §§ 422.2268, 423.2268(d) ("In conducting marketing activities, *a Part D plan* may not—(d) Solicit door-to-door for Medicare beneficiaries or through other unsolicited means of direct contact, including calling a beneficiary without the beneficiary initiating the contact.") (emphasis added); *see also* 42 C.F.R. § 423.4 (defining a Medicare Part D plan).

In her response, Relator attempts to rectify this pleading error by turning to the Health Insurance Portability and Accountability Act ("HIPAA"), specifically 42

---

[8] Defendants also argue that Relator's kickback theory is deficient because it does not allege that Defendants acted "knowingly and willfully." The SAC, however, specifically alleges that Defendants "knowingly and willfully offered these kickbacks to physicians in their Wellness Centers for improper purposes." SAC [69] ¶ 191.

[9] The SAC [69] also references § 70.4 of the CMS Medicare Marketing Guidelines. This section, however, simply cites 42 C.F.R. §§ 422.2268(d) and 423.2268(d).

U.S.C. § 1320d-6 ("Wrongful disclosure of individually identifiable health information"). Although the SAC makes general reference to the HIPAA statute, however, *see* SAC [69] ¶¶ 48, 147, this specific provision is notably absent. To the extent Relator is attempting to amend the SAC in her response brief, the Court rejects the effort. Relator cannot amend her complaint through a response to a motion to dismiss. *Adedeji v. Cobble*, No. 10-cv-0892, 2013 WL 449592, at *1 (N.D. Ill. Feb. 5, 2013). Currently, the lack of particularity fails to adequately place Defendants on notice of Plaintiff's theory of liability. *See United States ex rel. Hanna v. City of Chicago*, 834 F.3d 775, 779 (7th Cir. 2016) ("Where the allegedly false certification relates to a failure to comply with certain statutory and regulatory provisions, the plaintiff should be able to tell [the defendant] which ones it flouted, and how and when. If the particularity requirement is meant to ensure more thorough investigation before filing, it is not too much to ask that one aspect of that investigation include the specific provisions of law whose violation made the certification of compliance false."). The AAH Defendants' Motion to Dismiss [79], therefore, is granted as it relates to improper solicitation.

### e) *Improper Certification/Recertification*

All that remains is Relator's theory of improper certification. *See* SAC [69] ¶¶ 108-45. Unlike most of her other theories of liability, here, Relator provides multiple representative examples. Although some of these specific instances still suffer from fatal overgeneralization, *see, e.g., id.* ¶¶ 129-35, 137-45, others are sufficiently particular to satisfy Rule 9(b):

- Between approximately December 2008 and January 2009, Defendant Fitzpatrick ordered Relator and another nurse, Jolynn Bartlett, to fraudulently recertify nine AAH patients at Spring Meadows Nursing Home in Naperville, Illinois for unnecessary home health services. *Id.* ¶¶ 111-24.

- In approximately December 2010, Defendants Fitzpatrick and Shemanske ordered Relator to fraudulently certify A.Z., an AAH patient at Brighton Gardens in Orland Park, Illinois, for physical therapy. *Id.* ¶ 125.

- In approximately June 2011, Defendant Fitzpatrick ordered nurse Andrea Castrejon to recertify a patient for home health services even though Castrejon believed home health services were no longer necessary. *Id.* ¶ 127.

- On approximately May 30, 2015, Defendant Shemanske arranged for orders certifying a patient for skilled nursing care, even though Sue Suria, AAH's physical therapy supervisor, determined that skilled nursing care was unnecessary. *Id.* ¶ 136.

Defendants argue that Relator's improper certification/recertification theory is nonetheless deficient because she does not allege that any *physician* falsely certified or recertified patients; rather, Relator only claims action on the part of *nurses*. According to Defendants, it is *physicians*, not nurses, who ultimately certify and recertify patients for home health treatment. As the theory goes, therefore, certification by nurses is irrelevant to whether a claim is false, and thus immaterial to the government's decision to pay Medicare or Medicaid reimbursement claims.

Defendants misread the FCA's scope. The Act expressly imposes liability on those who "cause" false claims for payment to be submitted to the government, or "cause" a material false record or statement to be made or used. 31 U.S.C. § 3729(a)(1)(A)-(B). Moreover, the FCA places liability "not only on persons who cause false claims to be submitted or who cause false statements to be made, but

also on those who cause the claims or statements to be false in the first place." *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 738 (N.D. Ill. 2010) (citing *United States v. Bornstein*, 423 U.S. 303, 313 (1976)). Here, Relator alleges that Defendants knowingly drafted false physician orders for ineligible patients and submitted those orders to the patients' physicians for signature, and that such misrepresentations misled the certifying physicians. Such conduct falls under the FCA's purview. *See Bornstein*, 423 U.S. at 313 ("United . . . caused Model to submit false claims to the Government. . . . If United had not shipped any falsely branded tubes to Model, Model could not have incorporated such tubes into its radio kits and would not have had occasion to submit any false claims to the United States."); *U.S. ex rel. Landis v. Hospice Care of Kansas, LLC*, No. 06-2455-CM, 2010 WL 5067614, at *4 (D. Kan. Dec. 7, 2010) ("[P]laintiffs do not allege that the physicians made false certifications independently, but that the physicians could not legitimately exercise their medical judgment because defendants provided false information on which the physicians relied.").

Defendant further argues that Relator's allegations only highlight a disagreement of opinion amongst medical personnel, and a mere disagreement between non-physician employees and a certifying physician does not render the doctor's certification fraudulent. Facts that rely upon clinical medical judgments, however, "are not automatically excluded from liability under the FCA." *Landis*, 2010 WL 5067614, at *4; *U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983 (10th Cir. 2005) ("[W]e are not prepared to conclude that in all instances,

35

merely because the verification of a fact relies upon clinical medical judgments . . . the fact cannot form the basis of an FCA claim."). Moreover, Relator does not merely allege a difference of opinion; rather, she essentially claims that Defendants' misrepresentations prevented physicians from properly exercising their medical judgment in the first place. Such allegations do more than "second-guess" medical conclusions. *See Strom ex rel. U.S. v. Scios, Inc.*, 676 F. Supp. 2d 884, 891 (N.D. Cal. 2009) ("[T]his Court acknowledges that the Complaint alleges that doctors did not, in fact, make considered medical judgments. Instead, the Complaint alleges that doctors prescribed Natrecor for outpatient use *only because* they were induced to do so by Defendants' misrepresentations."). The AAH Defendants' Motion to Dismiss [79], therefore, is denied as it relates to improper certifications.

### D. Claims Against Great Lakes

Claims against AAH and the Individual Defendants aside, Defendant Great Lakes separately argues that Relator fails to adequately state any claims against Great Lakes in particular. Recall that, according to Relator, Great Lakes did not purchase AAH until approximately March 2015. Great Lakes argues that there are no sufficiently particular allegations that any fraudulent conduct continued after that date.

With or without direct allegations of fraudulent conduct, this Court finds that Relator has sufficiently alleged that Great Lakes may be liable as AAH's successor. The doctrine of successor liability "provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities." *Chicago Truck Drivers,*

36

*Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995). Under normal circumstances, successor liability applies to FCA cases. *United States ex rel. Ceas v. Chrysler Grp. LLC*, 78 F. Supp. 3d 869, 877 (N.D. Ill. 2015); *United States ex rel. Geschrey v. Generations Healthcare, LLC,* 922 F. Supp. 2d 695, 709 (N.D. Ill. 2012). Of course, successor liability does not automatically attach where one company acquires another. Successor liability applies only if: (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale. *Chi. Truck Drivers,* 59 F.3d at 49. In reviewing Relator's allegations, it must be noted that successor liability "is an equitable doctrine, not an inflexible command." *Id.* In "light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.,* 417 U.S. 249, 256 (1974).

Here, the court finds that, viewing the facts in the light most favorable to Relator, Relator has sufficiently alleged both notice and continuity at this stage of the proceedings. True, Relator's claims were not unsealed until April 26, 2016, a year after Great Lake's purchase. Relator alleges, however, that Great Lakes: (1) conducted a presale audit; (2) retained management level employees, including Defendant Shemanske; (3) operated the same business out of the same office; (4) employed the same staff; (5) took control of AAH's medical records and documents;

and (6) received AAH's Medicare licenses and patient accounts. For the purposes of a motion to dismiss, these facts indicate both notice and continuity. *See* SAC [69] ¶¶ 21-36; *see also Chi. Truck Drivers,* 59 F.3d at 49 ("New Tasemkin was owned by the daughter-in-law of Old Tasemkin's owner, Irving Steinberg; Steinberg's son Leslie, formerly the registered agent for Old Tasemkin, was New Tasemkin's president and secretary; New Tasemkin operated the same business (albeit from fewer locations), employed largely the same staff, and relied primarily on the same suppliers. Leslie Steinberg's active role in both old and new companies may well satisfy the notice prong; New Tasemkin's assumption of Old Tasemkin's corporate identity makes a strong case for substantial continuity."); *U.S. ex rel. Geschrey v. Generations Healthcare, LLC,* 922 F. Supp. 2d 695, 709 (N.D. Ill. 2012) ("The continuance of staff in management positions further supports the inference that Odyssey or its principals had actual notice of Generations's potential liability.").

### E.    Relator's Purported Release of Claims

Finally, Defendants claim that Relator's claims are barred by a release contained in a prior settlement agreement. As background, Relator brought a federal civil suit against AAH in 2012 alleging violations of the Fair Labor Standards Act. *See generally O'Donnell v. Angels at Home*, No. 1:12-cv-6762 (N.D. Ill. 2012). After Great Lakes purchased AAH during the course of Relator's pending employment suit, Relator filed a state civil suit against both AAH and Great Lakes alleging violations of the Uniform Fraudulent Transfers Act. *See generally O'Donnell v. Angels at Home*, No. 2015-L-8039 (Ill. Cir. Ct.). The parties settled

38

both suits shortly thereafter. Defendants allege that, as part of the underlying settlement agreement, Relator agreed to a release of all related claims, including those that form the subject of the present litigation.

Based upon the current record, this Court declines to rule upon Defendant's argument at this juncture. In Illinois, a release within a settlement agreement is governed by contract law. *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (citing *Farm Credit Bank of St. Louis v. Whitlock,* 581 N.E.2d 664, 667 (Ill. 1991)). Thus, where a release agreement "is clear and explicit, a court must enforce the agreement as written." *Id.* (citing *Rakowski v. Lucente,* 472 N.E.2d 791, 794 (Ill. 1984)). That is, both "the meaning of the instrument," and "the intention of the parties" must be gathered "from the face of the document," without the assistance of "parol evidence or any other extrinsic aids." *Id.* (citing *Rakowski,* 472 N.E.2d at 794). In contrast, "when a contract is ambiguous, construction of the agreement is a question of fact, and the finder of fact may consider parol evidence in determining the intent of the parties." *Id.* (citing *Whitlock,* 581 N.E.2d at 667). Here, the purported release statement contains the following language:

> **Mutual Release.** In consideration of the payments set forth in . . . this Agreement, and of the other promises and covenants set forth herein, the Parties agree to the following Mutual Release: (a) Steven O'Donnell and Amy O'Donnell, on behalf of themselves and their heirs, legatees, personal representatives, successors and assigns, hereby waive, release and forever discharge all employment claims and employment causes of action, and all claims asserted in the Federal Lawsuit and State Lawsuit, which they have, had, or may have through the date of this Agreement, whether known or unknown, from

> the beginning of time up to and including the date of this
> Agreement . . . .

Rel.'s Resp. [85] Ex. E at 3. At present, the Court need not delineate the exact scope of Relator's release agreement. For the purposes of Defendants' motions, it suffices to say that the mutual release does not clearly and explicitly release Relator's FCA claim. As such, the need to resort to extrinsic evidence to resolve any possible ambiguity reaches beyond the scope of Defendants' motions to dismiss. *See Mannie v. Potter*, 326 F. Supp. 2d 880, 882 (N.D. Ill. 2004).

### F.    Leave to Re-plead

In her response to the present motions, Relator requests leave to re-plead any claims dismissed by the Court, and predictably, Defendants insist that leave to re-plead should not be granted. Relator has the better of this argument. Although further amendment will constitute Relator's third try, "the Court notes that this is the first complaint actually challenged by motions to dismiss. Because Defendants have only had to answer once, and because the Court does not believe amendment would necessarily be futile, it grants leave to replead." *U.S. ex rel. Grenadyor v. Ukranian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 882 (N.D. Ill. 2012); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires."). Both Defendants and the Court, however, "have put Relator on notice of several deficiencies," and she must "be diligent about addressing them in any new complaint." *Id.* Needless to say, any failure to properly address the deficiencies will result in serious consequences for her case.

## IV.  Conclusion

Defendants' motions to dismiss [76, 79] are granted in part and denied in part as stated above.   Counts II and III of the SAC [69] are dismissed with prejudice.  The SAC is further dismissed as it relates to Defendant Richards, as well as to the extent Relator's theory of liability depends upon: (1) the improper inflation of patient visits; (2) manipulation of HHRG scores; (3) billing for duplicative personal care services; (4) kickbacks to Defendant Shemanske and physicians besides Dr. Zaman and Dr. Nagubadi; and (5) unlawful solicitation of patients.  The remaining portions of the SAC stand.  Relator is given leave to re-plead any claims dismissed pursuant to the Court's order, except for Counts II and III.

Date: June 20, 2017

Entered:

John Robert Blakey
United States District Judge
