UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF ILLINOIS *ex rel.* AMY O'DONNELL, | |
| Relator/Plaintiff, | Case No. 14-cv-1098 |
| v. | |
| AMERICA AT HOME HEALTHCARE AND NURSING SERVICES, LTD., d/b/a ANGELS AT HOME HEALTHCARE, *et al.* | Judge John Robert Blakey |
| Defendants. | |

# MEMORANDUM OPINION AND ORDER

Relator/Plaintiff Amy O'Donnell filed this *qui tam* action under the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, and its state counterpart, the Illinois False Claims Act (IFCA), 740 ILCS § 175/1, *et seq.*, on behalf of the United States and Illinois. Relator sues corporate defendants America at Home Healthcare and Nursing Services, Ltd. d/b/a Angels at Home Healthcare (AAH), and AAH's purported successor, Great Lakes Acquisition Corp. d/b/a Great Lakes Caring. Relator also sues former AAH owners Rachel Fitzpatrick and Tami Shemanske. Relator alleges that, starting in 2006, AAH and its former owners fraudulently billed Medicare and Medicaid, and that Great Lakes continued AAH's fraudulent practices after buying AAH in early 2015.

Relator filed her third amended complaint in July 2017. [99]. Shortly after, Defendants moved to dismiss. [113]. Defendants also filed counterclaims against

Relator, seeking to rescind an allegedly fraudulent settlement agreement between Relator, her husband, and the corporate defendants that resolved two lawsuits unrelated to this case. [123]. Defendants moved to join Relator's husband, Steven O'Donnell,[1] as a counterclaim defendant, [124], while Relator moved to dismiss the counterclaims, [133]. For the reasons explained below, this Court partially grants Defendants' motion to dismiss, and denies both Defendants' motion to join O'Donnell and Relator's motion to dismiss the counterclaims as moot because this Court lacks jurisdiction over the counterclaims.

This Court presumes familiarity with, and incorporates by reference, its prior opinion partially granting Defendants' motion to dismiss Relator's second amended complaint. [94]. Thus, the Background section below describes only additional details about the parties' earlier lawsuits and settlement agreement that the prior opinion did not address. Likewise, there is no need to repeat in detail the required elements of each statute at issue throughout the Analysis section.

**I.    Background**

Relator and her husband both worked for AAH from January 2008 through June 2011. [123] ¶¶ 11–12. In August 2012, the O'Donnells sued AAH in this district, alleging violations of the Fair Labor Standards Act (FLSA). *Id.* ¶ 18; *see also O'Donnell v. Angels at Home*, No. 1:12-cv-6762 (N.D. Ill. 2012). Great Lakes bought AAH in 2015 during the course of that suit, which led the O'Donnells to file a state suit against AAH and Great Lakes, alleging violations of the Uniform Fraudulent Transfers Act (UFTA). *See O'Donnell v. Angels at Home*, No. 2015-L-

---

[1] Throughout this opinion, "Relator" refers to Amy O'Donnell; "O'Donnell" refers to Steven O'Donnell.

2

8039 (Ill. Cir. Ct.). The parties settled the FLSA and UFTA cases through one settlement agreement in August 2015. [123] ¶ 20. In relevant part, it provides:

> **Mutual Release.** In consideration of the payments set forth in . . . this Agreement, and of the other promises and covenants set forth herein, the Parties agree to the following Mutual Release: (a) Steven O'Donnell and Amy O'Donnell, on behalf of themselves and their heirs, legatees, personal representatives, successors and assigns, hereby waive, release and forever discharge all employment claims and employment causes of action, and all claims asserted in the Federal Lawsuit and State Lawsuit, which they have, had, or may have through the date of this Agreement, whether known or unknown, from the beginning of time up to and including the date of this Agreement.

[94] at 39–40. Relator filed this FCA case in February 2014, and the case remained under seal until April 2016. *Id.* ¶ 27. Thus, Defendants did not know about the FCA case during the settlement negotiations; they had no notice of this case until Relator served them with the complaint in September 2016. *Id.* ¶ 28.

## II. Legal Standard

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). To survive a motion to dismiss, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the

pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008). In evaluating a complaint, this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Because the FCA and IFCA are anti-fraud statutes, claims under both must also meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. *United States ex rel. Gross v. AIDS Research Alliance–Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) demands that claimants alleging fraud "state with particularity the circumstances constituting fraud." Particularity resembles a reporter's hook: a plaintiff "ordinarily must describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotation marks omitted). Ultimately, a plaintiff must always inject "precision and some measure of substantiation" into fraud

4

allegations.  *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (internal quotation marks omitted).

**III.  Analysis**

    **A.  Defendants' Motion to Dismiss**

        **1.  Allegations Against Great Lakes**

Relator's claims against Great Lakes for successor liability survived the last motion to dismiss.  [94] at 36.  On this motion, however, Defendants argue for the first time that Great Lakes cannot be liable as AAH's successor because Great Lakes is AAH's parent company, not its successor.  In support, they submitted a filing from the Illinois Secretary of State's website showing that AAH still exists as a corporation in good standing.  [114-1] at 2.  This Court may take judicial notice of information from the Illinois Secretary of State's website.  Fed. R. Evid. 201; *see also Lengerich v. Columbia Coll.*, 633 F. Supp. 2d 599, 607 n.2 (N.D. Ill. 2009).

The doctrine of successor liability, of course, applies only to successor companies.  *See* [94] at 36–37.  "Successor" means a corporation "vested with the rights and duties of an earlier corporation" through "amalgamation, consolidation, or other assumption of interests."  Black's Law Dictionary 1660 (10th ed. 2014).  In other words, a successor corporation "must entirely absorb its predecessor: its business, assets, rights and liability.  At that point, the predecessor ceases to exist."  *AA Sales & Assocs., Inc. v. JT&T Prod. Corp.*, No. 98-cv-7954, 2000 WL 1557940, at *2 (N.D. Ill. Oct. 19, 2000).  Because AAH still exists, Great Lakes cannot be liable as its successor.

Although successor liability does not apply here, a parent corporation may be liable for a subsidiary's actions if the parent exercises enough control and direction over the subsidiary that a court may properly pierce the parent's corporate veil. *See IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998) (collecting cases). That said, Relator does not allege any facts to support Great Lakes' liability as a parent corporation; she conceded in earlier briefing that she "does not bring any claims against Great Lakes for its own commission of FCA or IFCA violations." [85] at 60 n.17.

Because AAH and Great Lakes inexplicably waited until the third amended complaint to clarify their corporate structure, this Court grants the motion to dismiss Great Lakes without prejudice. If Relator obtains information about Great Lakes during discovery that gives her a good-faith basis for amending her complaint to assert new claims against Great Lakes, she must file a timely motion seeking this Court's permission to amend her complaint accordingly.

### 2. Upcoding

#### a) *Visit Inflation*

To her previously dismissed allegations about AAH's visit inflation, [94] at 27, Relator adds one new allegation here. She now says that she cannot "recall the names of these patients without access to her former patients' medical records, but Defendants can identify them by searching Relator's patient records during the time of her employment for the small number of patients that had" a specific diagnosis related to fitting a urinary device. [99] ¶ 224. Rule 9(b)'s pleading

6

requirements, however, do not allow Relator's visit-inflation theory to proceed based upon that one paragraph.

This Court previously dismissed Relator's visit-inflation allegations in part because she did not list patient names, but also because she did not provide any of the specific details or representative examples that Rule 9(b) requires. [94] at 25–27. Relator still speaks "almost entirely in generalities" in this section of her new complaint. *Id.* at 26. Again, her most specific allegation claims that, in late January 2012, an AAH employee told physical therapist Sue Suria to "do at least 6 or 7" visits for a patient who only needed two. [99] ¶¶ 229. But Relator again fails to specify whether Suria actually followed that request. This Court grants the motion to dismiss with prejudice to the extent Relator's theory of liability depends upon visit inflation, for the reasons stated in its prior opinion. [94] at 27.

### b) *HHRG Scores*

Relator does not change or add to her previously dismissed allegations about HHRG scores in the third amended complaint. [99] ¶¶ 230–37. This Court grants the motion to dismiss with prejudice to the extent Relator's theory of liability depends upon HHRG scores, for the reasons stated in its prior opinion. [94] at 28.

### c) *Physical Therapy Diagnoses*

Relator's previous allegations about improper physical therapy diagnoses spoke purely in generalities. In her third amended complaint, she fleshes out one example with additional details:

> [In] approximately 2010, [AAH] nurse Laura Saldana performed an initial assessment on a patient with a heart condition in the Plum

Landing facility located in Joliet, Illinois. Ms. Saldana determined that the patient's condition did not require physical therapy. Subsequently, [AAH] altered the patient's Form CMS 485 to document a primary diagnosis requiring physical therapy, and ordered physical therapy services for the patient, which [AAH] proceeded to provide. During the initial 60-day period of home health care, the patient died from therapy-related stress. [AAH] still submitted claims and received reimbursement by Medicare for services provided to the patient.

[99] ¶ 243. Pleading fraud with particularity requires "at least one specific instance of wrongdoing that satisfies the who, what, where, when and how requirements of Rule 9(b)." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 895 F. Supp. 2d 872, 878–79 (N.D. Ill. 2012). Although Relator's other allegations about physical therapy diagnoses—standing alone—would fail to satisfy Rule 9(b), the amended allegation in paragraph 243 minimally, but sufficiently, describes "the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (internal quotation marks omitted). Although Relator does not provide the patient's name, she describes the patient with enough details to substitute for a name (hopefully Plum Landing did not have more than one patient die from therapy-related stress during the relevant period). This Court denies Defendants' motion to dismiss as to the allegations of improper physical therapy diagnoses.

### 3. Double Billing

To her previously dismissed allegations about double billing, [94] at 28–29, Relator adds one new example here. Relator alleges that she:

> provided skilled-nursing care to one patient in the dementia units at Brighton Gardens named M.B. with Parkinson's Disease throughout 2009 and 2010. Also throughout that time period, Relator observed that [AAH] would send a home health aide to provide intermittent bathing and dressing service to M.B., even though M.B.'s package with

8

> Brighton Gardens already included such care. M.B. did not need specialized bathing and dressing services, and the assisted living facilities' [sic] caregivers were able to, and did, provide the same bathing and dressing services to M.B. during the same time period.

[99] ¶ 256. Defendants argue that this new example still fails to satisfy Rule 9(b), that AAH's aide provided necessary services, and that Relator does not show that AAH submitted a false claim. [114] at 12. This Court disagrees.

Standing alone, Relator's other allegations about double billing would not pass muster under Rule 9(b), for the reasons this Court explained in its prior opinion. [94] at 28–29. Relator's new allegation about M.B., however, sufficiently describes "the who, what, when, where, and how of the fraud." *Pirelli*, 631 F.3d at 441–42 (internal quotation marks omitted). At first glance, the "when" seems general, but "intermittent" has a specific meaning under the Medicare laws that Relator cites in her complaint. *See, e.g.*, [99] ¶¶ 47, 50. "Intermittent" refers to care that a patient needs fewer than seven days per week, but on a "medically predictable recurring" basis, usually "at least once every 60 days." Ctrs. for Medicare & Medicaid Servs., Medicare Benefit Policy Manual Ch. 7, § 40.1.3 (2017).

Relator also alleges that Medicare and other government programs served "many" of AAH's patients and provided "a large portion" of AAH's revenue. [99] ¶ 102. On a motion to dismiss, this Court draws all reasonable inferences in Relator's favor. *Iqbal*, 556 U.S. at 678. Thus, at this point in the proceedings, Relator pleads with sufficient particularity that AAH provided medically unnecessary services to a specific patient at a specific facility at least once every 60 days (likely more often,

9

given the nature of the services) during 2009 and 2010, and then billed Medicare for those services.

Defendants argue that they did nothing wrong because Medicare pays for "reasonable and necessary home health services" when a patient also receives supplemental services that do not qualify as "skilled nursing care." [114] at 12. That defense rests on this Court determining that AAH provided *necessary* services—precisely what Relator contests. She says that M.B. did not need AAH's services; on a motion to dismiss, this Court must believe her. *Iqbal*, 556 U.S. at 678. If the services were necessary, Defendants may show that with a more developed factual record at a later stage in this litigation.

Lastly, Defendants argue that Relator fails to show that AAH submitted any false claims to Medicare for M.B.'s care. This Court addressed such arguments in detail in its prior opinion. [94] at 22–25. Relator worked as a nurse for AAH, and AAH fired her in 2011, almost three years before she filed this suit. Given Relator's position—one that "does not appear to include regular access to medical bills"—this Court does not "see how she would have been able to plead more facts pertaining to the billing process." *Presser*, 836 F.3d at 778. At present, this Court can reasonably infer that AAH submitted claims to Medicare for M.B.'s care. [94] at 25; *see also U.S. ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1167 (N.D. Ill. 2007) ("Given the significant portion of medical care in this country" that Medicare and Medicaid finance, "relators have drawn a reasonable inference" that the

defendants submitted reimbursement claims to the government.). This Court denies Defendants' motion to dismiss as to the double billing allegations.

### 4. Kickbacks

This Court previously dismissed Relator's allegations that AAH paid illegal kickbacks to Shemanske because Relator failed to meet her pleading burden under Rule 9(b). [94] at 30. Defendants argue that Relator's amended allegations about Shemanske's kickbacks similarly fall short under Rule 9(b). [114] at 7. Alternatively, they argue that a safe harbor under the Anti-Kickback Statute (AKS) protects Shemanske, and that Relator fails to plead the AKS' "heightened scienter." *Id.* at 7–8. This Court disagrees.

With her third amended complaint, Relator corrected her pleading deficiencies by filing a detailed spreadsheet showing weekly breakdowns of AAH's Medicare referrals from Shemanske and other marketers, as well as from specific facilities, over several years. *See* [100-1] (sealed exhibit). Relator alleges that AAH's CEO told the HR Director to track referrals and recertifications within Shemanske's territory—which included five facilities—to calculate a $100 bonus for Shemanske for every referral and recertification. [99] ¶ 188. Based upon the spreadsheet, Relator provides the details that Rule 9(b) demands, and she injects "precision and some measure of substantiation" into her kickback allegations. *Presser*, 836 F.3d at 776. Relator now alleges the who (AAH, through its CEO), what and when ($100 bonuses broken down on a weekly basis for several years), where (five specific facilities that composed Shemanske's territory), and how

(having AAH's HR Director track Medicare referrals on a weekly basis) of the kickbacks. [99] ¶¶ 187–201; [100-1].

Defendants argue that the spreadsheet shows only the referrals themselves, not illicit referral bonuses. Perhaps, but on a motion to dismiss this Court draws all reasonable inferences in Relator's favor. *Iqbal*, 556 U.S. at 678. In the context of Relator's other allegations, this Court can reasonably infer that the spreadsheet shows referrals tracked for the purpose of providing corresponding kickbacks through $100 bonuses. Defendants also argue that Relator fails to tie the alleged kickbacks to specific Medicare claims. Again, given her limited access to billing information at this stage, Relator only needs to create a reasonable inference that Defendants submitted claims to Medicare. *Presser*, 836 F.3d at 778; *see also Kennedy*, 512 F. Supp. 2d at 1167. In the context of her other allegations, this Court can reasonably infer that Defendants submitted claims to Medicare for at least some of the patients for whom Shemanske received the alleged kickbacks, such as the aforementioned M.B. whom AAH recertified in 2009 and 2010 for services at Brighton Gardens, a facility within Shemanske's territory. [99] ¶¶ 190, 256.

As for the AKS safe harbor, it applies to amounts that an employer pays an employee pursuant to a *bona fide* employment relationship, 42 U.S.C. § 1320a-7b(b)(3)(B), meaning that the employer must make the payments in good faith without intending to solicit or offer a kickback, *see McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 883 n.5 (7th Cir. 2012) (defining bona fide). Whether AAH

12

made referral payments to Shemanske in good faith presents a question of fact not appropriate for resolution on a motion to dismiss. If AAH made the alleged payments in good faith, then AAH may rely upon that defense at summary judgment (or later at trial). But the Federal Rules of Civil Procedure do not require a complaint to anticipate or "attempt to plead around" all possible defenses, so this Court may not dismiss Relator's complaint for failing to address the safe harbor. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004).

Finally, Defendants argue that Relator fails to plead the criminal scienter that the AKS requires. Not so. The cases that Defendants cite dealt with AKS claims at summary judgment. In contrast, Rule 9(b) allows Relator to plead "intent, knowledge, and other conditions of a person's mind" through general allegations, although she must plead the underlying AKS violation with sufficient particularity. [94] at 2. A person violates the AKS by offering remuneration to another person when *one purpose*—not necessarily the primary purpose—of the offer or payment is to induce Medicaid or Medicare patient referrals. *See United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011) (collecting cases). Thus, Relator adequately pleads that AAH knowingly paid illegal kickbacks to induce Shemanske "to obtain illegal Medicare referrals and recertifications." [99] ¶ 196.

### 5. Solicitation

This Court previously dismissed Relator's solicitation claims because she failed to plead any unlawful practices. [94] at 33. Defendants argue that Relator's amended solicitation allegations still fail to state a claim because she does not plead

13

violations of the Health Insurance Portability and Accountability Act (HIPAA), and regardless, HIPAA violations cannot form the basis for FCA liability. [114] at 4–5. This Court disagrees.

First, Relator adequately pleads HIPAA violations under 42 U.S.C. § 1320d-6(a), which criminalizes knowingly using, obtaining, or disclosing an individual's identifiable health information without authorization. Relator alleges that Fitzpatrick and Shemanske searched confidential medical charts at different facilities to collect the names of patients they could solicit for home health services (including unnecessary services). *See, e.g.*, [99] ¶ 151 (In "late December 2010, while Relator was still staffed at Brighton Gardens," she saw "Defendants Fitzpatrick and Shemanske searching confidential Brighton Gardens patient medical charts for individuals who were not [AAH patients] and making a list of individuals to target as home health patients."). Thus, Relator alleges that Fitzpatrick and Shemanske knowingly obtained private health information without authorization, as prohibited by the statute.

Defendants argue that their conduct falls within an exception that allows entities like AAH to use or disclose protected health information for face-to-face marketing. 45 C.F.R. § 164.508(a)(3)(i)(A). Regardless of whether Defendants' face-to-face solicitation technically falls within that exception, unlawfully *obtaining* information in the first place certainly does not fall within it. By its plain language, section 164.508 protects using and disclosing health information under certain circumstances, not obtaining it initially.

14

Second, at this stage of the case, Relator adequately pleads potential FCA liability stemming from the alleged HIPAA violations. Defendants correctly point out that no cases exist in which FCA liability arose from a HIPAA violation. [114] at 5. The other side of that coin, however, is that no cases exist saying that FCA liability *cannot* arise from a HIPAA violation. Relator has a two-fold theory for the resulting FCA violations: (1) Defendants knowingly billed the government for unnecessary medical services[2] after obtaining patients' information unlawfully; and (2) Defendants submitted claims and cost reports to the government that impliedly certified compliance with Medicare laws and regulations, but knowingly failed to disclose their HIPAA violations. *See* [128] at 9–10.

Defendants take issue with the implied certification theory, arguing that Relator fails to satisfy the Supreme Court's materiality standard from *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) because HIPAA violations are not material to the government's decision to pay claims. Under the FCA, something is "material" when it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see also United States v. Rogan,* 517 F.3d 449, 452 (7th Cir. 2008). This Court addressed materiality in depth in its prior opinion and found that the second amended complaint sufficiently pled material misrepresentations. [94] at 12–20. The third amended complaint sufficiently pleads material misrepresentations too.

---

[2] A theory this Court already upheld in its prior opinion. [94] at 33.

15

As in *Escobar*, Relator explicitly alleges that complying with HIPAA's criminal provisions is a condition of payment. [99] ¶ 178; *see* [94] at 18 (explaining *Escobar*). Relator also alleges that unlawfully soliciting patients through HIPAA violations goes "to the very essence of the bargain" between the government and health care providers, because that solicitation subjects patients to abusive marketing practices and unnecessary care from providers that they trust to help them. [99] ¶ 179. Whether something constitutes a material misrepresentation presents an objective question. *Rogan*, 517 F.3d at 452. Although no HIPAA-based FCA cases exist, this Court can analogize to other FCA cases. If "information that a hospital has purchased patients by paying kickbacks has a good probability" of affecting a payment decision, *id.*, then information that a home health agency has pilfered protected health data to solicit patients has a good probability of affecting a payment decision too. Finally, Relator alleges that the government does not knowingly pay claims to providers who violate § 1320d-6(a). [99] ¶ 180. These allegations suffice to keep Relator's solicitation theory alive for now.

### 6. Leave to Replead

All told, Relator has had four chances to plead particularized fraud claims against Defendants. After finding Relator's third attempt partially deficient under Rule 9(b), this Court warned Relator that not fixing the deficiencies would "result in serious consequences for her case." [94] at 40. Because Relator failed to correct some deficiencies after that warning, this Court does not grant leave to replead any dismissed claims, except potential claims against Great Lakes as noted above.

Rule 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." But even if Relator could theoretically cure the pleading deficiencies through another amended complaint, justice does not require that this Court give Relator a fifth bite at the apple. *See, e.g., Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1322–23 (7th Cir. 1998) (The plaintiff "has had three chances over the course of three years to state a claim and the district judge was not required to give her another chance."). The forewarned serious consequences manifest here as with-prejudice dismissals for Relator's claims about visit inflation and HHRG scores.

## IV. Defendants' Counterclaims

Defendants' counterclaims allege that Relator and her husband (who is not a party to this case) fraudulently induced Defendants to settle the FLSA and UFTA cases by failing to disclose the existence of this FCA case; Defendants also say that they executed the settlement agreement under a mistake of fact because they believed that the agreement resolved all legal disputes between the parties. [123] at 9–10. Defendants ask this Court to rescind the settlement agreement, award them damages, and enforce certain confidentiality provisions from the O'Donnells' employment agreements. *Id.* at 11. Defendants also want to join O'Donnell as a counterclaim defendant. [124]. Relator moved to dismiss the counterclaims, arguing that this Court lacks jurisdiction over them. [133].

Defendants assert permissive counterclaims here, because the counterclaims arise from different events (Relator's failure to disclose her FCA claims during settlement negotiations) than the underlying events that led to Relator's claims

17

against Defendants in this suit (Defendants' alleged FCA violations). Fed. R. Civ. P. 13(a), (b); s*ee Oak Park Trust & Sav. Bank v. Therkildsen*, 209 F.3d 648, 651 (7th Cir. 2000). Thus, *if* this Court has jurisdiction over the counterclaims, it would only have supplemental jurisdiction under 28 U.S.C. § 1367(a). *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 410 (7th Cir. 2004). For supplemental jurisdiction to exist, the counterclaims must "form part of the same case or controversy" as Relator's FCA claims, meaning they must "derive from a common nucleus of operative fact." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

No common nucleus exists here. The counterclaims relate to the FCA claims only because they implicate the fact that the FCA claims *existed* when the parties settled their previous lawsuits. *Cf. Birdo v. Gomez*, 214 F. Supp. 3d 709, 721 (N.D. Ill. 2016) (supplemental jurisdiction existed for state claims deriving from the same underlying act as the federal claims and allegedly inspired by the same motive); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008) (supplemental jurisdiction existed for breach of contract claims over a gaming compact between Wisconsin and the Ho-Chunk Nation where the federal claim sought to enjoin the Nation's gaming activities under the same compact); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 166 (1997) (supplemental jurisdiction existed for state claims stemming from the same series of events as the federal claims); *Ammerman v. Sween*, 54 F.3d 423, 424 (7th Cir. 1995) (supplemental jurisdiction existed for a

18

state tort claim when facts relevant to the alleged assault also supported the plaintiff's Title VII claim).

Further, the evidence that Relator will rely upon to support her FCA claims will not help to resolve Defendants' counterclaims; Defendants would need to delve into the parties' actions and states of mind when they entered the settlement agreement, and the precise meaning of the agreement's release provision. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994) (holding that ancillary jurisdiction did not apply where "the facts to be determined with regard to" the state claims "are quite separate from the facts to be determined in the principal suit"). This Court lacks jurisdiction to hear Defendants' counterclaims under § 1367(a) because they do not form part of the same case or controversy as Relator's FCA claims. Thus, this Court denies Defendants' motion to join O'Donnell and Relator's motion to dismiss the counterclaims as moot.

## V. Conclusion

This Court partially grants and partially denies Defendants' motion to dismiss [113]. With the exception of potential claims against Great Lakes, Relator does not have leave to replead any dismissed claims. This Court lacks jurisdiction over Defendants' counterclaims [123], and thus denies as moot Defendants' motion to join Steven O'Donnell as a counterclaim defendant [124] and Relator's motion to dismiss the counterclaims [133]. This case remains set for a status hearing at 9:45 a.m. on 1/30/2018 in Courtroom 1203. The parties should come prepared to set case management dates.

Date: January 8, 2018

Entered:

_____
John Robert Blakey
United States District Judge